# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | | |
|---|---|---|
| GLORIA L. JOHNSON-ESTER and, <br> MONTELL JOHNSON <br><br> Plaintiffs, <br><br> v. <br><br> DR. WILLARD ELYEA, <br> DR. LAWRENCE NGU, KARY <br> SHERIDAN, and NEDRA CHANDLER, <br><br> Defendants. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) | CASE NO.: 07-CV-4190 <br><br> Judge Robert M. Dow, Jr. |

## MEMORANDUM OPINION AND ORDER

On July 25, 2007, Plaintiffs filed a two-count complaint pursuant to 42 U.S.C. § 1983. In Count I, Plaintiffs contend that Defendants Dr. Willard Elyea ("Elyea"), Dr. Lawrence Ngu ("Ngu"), Kary Sheridan ("Sheridan"), and Nedra Chandler ("Chandler") violated Plaintiff Montell Johnson's ("Johnson") constitutional rights by failing to render adequate medical care in violation of the 8th and 14th Amendments. In Count II, Plaintiffs allege that Defendant Chandler violated Plaintiff Gloria Johnson-Ester's ("Johnson-Ester") First and Fourteenth Amendment rights when she prevented Johnson-Ester from visiting and communicating with Johnson (who is Johnson-Ester's son) while he was held in Dixon Correctional Center.

All of the Defendants contend, *inter alia*, that they are entitled to judgment as a matter of law under the Prisoner Litigation Reform Act ("PLRA") because Plaintiffs failed to exhaust their administrative remedies before filing this lawsuit. The Seventh Circuit recently held in *Pavey v. Conley*, 544 F.3d 739, 741-42 (2008), that exhaustion is a threshold issue that must be resolved by the district judge prior to addressing the merits of the case. Because of the serious physical

and mental impairments from which Plaintiff Johnson suffers, the exhaustion issue in this case is far from straightforward, but at the end of the day the Court concludes that Defendants have not carried their burden of establishing that Plaintiffs failed to exhaust *available* administrative remedies. Accordingly, this case will proceed on the merits.

## I. Background

### A. Introduction

In 1999, Plaintiff Montell Johnson was convicted of murder and sentenced to a forty-year term of imprisonment. Since his conviction, Johnson has been in the custody of the Illinois Department of Corrections ("IDOC").[1] The undisputed facts of record in this case[2] establish that on various occasions Johnson has been made aware of the grievance procedures during orientation sessions and through materials contained in an orientation handbook. The record also shows that on various occasions in 1995, 2001, and 2003, Johnson filed grievances through the appropriate channels and exhausted his administrative remedies on those occasions.

Johnson was diagnosed with multiple sclerosis in 2001, after his incarceration period began. Although Johnson has spent time in several facilities during his period of incarceration, the facts giving rise to this complaint and relevant for the disposition of the exhaustion issue currently before the Court for decision occurred while Johnson was incarcerated at the Dixon Correctional Center ("Dixon").

Johnson was transferred to Dixon around April 17, 2006. At that point, he had been diagnosed as a paraplegic with advanced secondary progressive multiple sclerosis. When

---

[1] In late 2008, Johnson's sentence was commuted by then-Governor Blagojevich. However, Johnson remains in state custody pending possible extradition to California on another criminal matter.

[2] Those facts have been taken from the parties' submissions in support of and in opposition to summary judgment and from various materials submitted at other times in the case, including in separate submissions solely addressing the exhaustion issue.

2

Johnson entered Dixon, he was placed in the infirmary, where he remained for all relevant periods. Johnson required "heavy care" from the staff at Dixon, including assistance with "feeding and all ADLs" (activities of daily life).

The medical records that have been provided to the Court over the course of this action confirm that Johnson's condition continued to deteriorate while he was housed at Dixon. Several months after Johnson entered Dixon, on September 22, 2006, he executed a Health Care Power of Attorney in favor of his mother, Gloria Johnson-Ester. By October 2006, Johnson's speech was "garbled," and by February 2007, he had difficulty verbalizing his needs and experienced episodes of "incoherent communication." A May 2007 entry in Johnson's records similarly notes "unintelligible communication," "unintelligible muttering," and "[m]umbling," and states that Mr. Johnson was "hard to understand." Other entries around the same time period indicate that Mr. Johnson required assistance with feeding and repositioning on his bed, could not ambulate, and was "fully dependent on others" for all activities of daily life. Some entries even suggest that Mr. Johnson was "irrational" and moved in and out of lucidity during his conversations.

As noted above, in this lawsuit Plaintiffs allege that Defendants violated Johnson's constitutional rights by failing to render adequate medical care at Dixon in violation of the 8th and 14th Amendments. As such, Plaintiffs' complaint states a Section 1983 claim by a prisoner that is subject to the PLRA's exhaustion requirements. It is clear that Johnson himself never filed a formal grievance regarding his medical care. It also appears from the record that he never asked his inmate porter, his counselor, or anyone else to assist him in filing a formal grievance relating to his health care at Dixon during the relevant time frame.[3]

---

[3] Plaintiffs reference [207, at 2-3] various verbal complaints that Mr. Johnson made while at Dixon, but the complaints to which they refer concern incidents that do not directly relate to the medical conditions

It is equally clear, however – as Defendants acknowledge – that Ms. Johnson-Ester and Plaintiffs' attorneys "agitated for better care through correspondence and by inciting others to write on [Mr. Johnson's] behalf." [150, at 3.] In fact, it is undisputed that between April 20 and June 12, 2007, several letters were sent on Mr. Johnson's behalf addressed to each of the Defendants (and others in the DOC chain of command) setting forth concerns about Mr. Johnson's medical condition and complaining about a lack of "appropriate medical care." The record also clearly reflects the fact that the letters were received, that various IDOC personnel discussed and even prepared draft responses, but that no formal responses ever were sent.

The critical question is whether Defendants can carry the burden of showing that Plaintiffs did not exhaust all *available* administrative remedies prior to bringing this lawsuit. All of the Defendants contend that because the specific grievance procedures set forth in the pertinent regulations were not properly invoked by Johnson or anyone else within 60 days of the discovery of the incident, occurrence, or problem that gave rise to his grievance (see 20 Ill. Admin Code § 504.810), Plaintiffs did not exhaust their administrative remedies and cannot now go back to pursue any unexhausted remedies that they may have had. Plaintiffs counter that as a result of his physical and mental debilities, Johnson was unable to pursue exhaustion of his administrative remedies on his own and cannot be faulted for not exhausting remedies that were unavailable to him in his condition. Plaintiffs also submit that the letters sent to the Warden and others at the IDOC on Johnson's behalf appropriately exhausted the available administrative remedies and thus satisfied the exhaustion requirement.

---

at issue in this case, and thus cannot be considered attempts to invoke his administrative remedies for purposes of this lawsuit.

B.  **Administrative Grievance Procedures**

IDOC regulations set out the procedures that "offenders" must follow for the "Filing of Grievances" in Ill. Admin. Code § 504.810. Those procedures first require an inmate to attempt to resolve grievances through his counselor. Ill. Admin. Code § 504.810(a). If that step is unsuccessful, the inmate may file a written grievance on a specified form within 60 days of discovery of the incident or problem giving rise to the grievance unless good cause can be shown for extending that period. *Id*. The grievance form must be addressed to the Grievance Officer ("GO") and "deposited in the living unit mailbox or other designated repository." Ill. Admin. Code § 504.810(b). The grievance must contain facts regarding the complaint and the people involved in events giving rise to the complaint. *Id*.

The IDOC regulations provide special grievance procedures for "disabled" and "impaired" inmates. 20 Ill. Admin. Code 504.810(c). In particular, "[s]taff assistance shall be available as requested by those offenders who cannot prepare their grievances unaided, as determined by institutional staff." *Id*. In addition, the regulations impose on each facility a duty to take "reasonable steps to ensure that the grievance procedure is accessible to offenders who are impaired, disabled or unable to communicate in the English language." 20 Ill. Admin. Code § 504.810(c)(2). Inmates are to be informed of the grievance procedure at the admitting facility and may request further information from their counselors. 20 Ill. Admin. Code § 504.810(d).

A Grievance Officer provides the initial review of grievances. 20 Ill. Admin. Code § 504.830(a). If the GO does not deem the grievance to be without merit, the regulations (20 Ill. Admin. Code § 504.830(d)) direct the GO to consider the grievance and report findings and recommendations to the Chief Administrative Officer ("CAO"), who is defined to be highest ranking official of a correctional facility (20 Ill. Admin. Code § 504.802). At Dixon, that person

was Defendant Chandler, who was the Warden. The CAO then advises the inmate of his or her decision within two months where reasonably feasible under the circumstances. 20 Ill. Admin. Code § 504.830(d).

The regulations specifically permit an inmate to request that a grievance "be handled on an emergency basis by forwarding the grievance directly" to the CAO. 20 Ill. Admin. Code § 504.840. If the CAO determines that there is a substantial risk of imminent personal injury or other serious or irreparable harm to the inmate, the grievance must be handled on an emergency basis and dealt with on an expedited basis. See 20 Ill. Admin. Code § 504.840(a), (b).

If the inmate is not satisfied with the CAO's decision, he may appeal in writing to the Director of the IDOC within 30 days. 20 Ill. Admin. Code § 504.850(a). After reviewing the grievance and the responses by the GO and the CAO, the Director decides whether the grievance requires a hearing before the Administrative Review Board ("ARB") or is without merit or can be resolved without a hearing. 20 Ill. Admin. Code § 504.850(b). If the grievance proceeds to a hearing, the ARB submits a written report to the Director who reviews the findings and recommendations of the ARB and makes a final determination within 6 months. 20 Ill. Admin. Code § 504.850(b)-(f). The regulations provide that the ARB shall expedite the processing of the grievance in an emergency situation. 20 Ill. Admin. Code § 504.850(g).

### C. The Individual Defendants

Dr. Willard Elyea was the Medical Director of the Illinois Department of Corrections from the time that Johnson entered Dixon until May 1, 2007. During all relevant periods, Dr. Lawrence Ngu was the medical director at Dixon. Kary Sheridan formerly was the Health Care Unit Administrator ("HCUA") at Dixon. She served in that position from the time Johnson entered Dixon until August 3, 2007. Nedra Chandler is, and was at all relevant times, the

Warden at Dixon. She also functioned at times as the acting HCUA and personally observed Johnson when she visited the infirmary two to three times a week. By virtue of her observations and the letters sent to her, at some point, Defendant Chandler became aware of the nature of Johnson's medical conditions that ultimately led to this lawsuit.

## II. Analysis

### A. Exhaustion as a threshold issue for the Court to decide.

In *Pavey v. Conley*, 544 F.3d 739, 740 (7th Cir. 2008), the Seventh Circuit addressed "whether a prisoner plaintiff in a suit for damages governed by the Prison Litigation Reform Act is entitled by the Seventh Amendment to a jury trial on any debatable factual issues relating to the defense of failure to exhaust administrative remedies." In a decision authored by Judge Posner, the court answered that question in the negative, holding that the district judge must determine as a threshold matter, before proceeding to disposition (or, in most cases, even discovery) on the merits, whether "the prisoner has properly exhausted his administrative remedies." *Id.* at 741-42; see also *Hamilton v. Allen*, 2009 WL 395470, at *2 (N.D. Ill. Feb. 18, 2009) ("The issue of exhaustion of available administrative remedies is a threshold inquiry for the court").

In *Pavey*, the Seventh Circuit also provided considerable guidance to district judges with respect to "[t]he sequence to be followed in a case in which exhaustion is contested" (*id.* at 742), as is the case here. To begin with, the district judge is directed to "conduct[] a hearing on exhaustion" and to "permit[] whatever discovery relating to exhaustion he deems appropriate." *Id.* The district judge then must determine whether the prisoner did in fact exhaust his or her available remedies. "If the judge determines that the prisoner did not exhaust his administrative remedies, the judge will then determine whether (a) the plaintiff has failed to exhaust his

administrative remedies, and so he must go back and exhaust; (b) or, although he has no unexhausted administrative remedies, the failure to exhaust was innocent (as where prison officials prevent a prisoner from exhausting his remedies), and so he must be given another chance to exhaust (provided that there exist remedies that he will be permitted by the prison authorities to exhaust, so that he's not just being given a runaround); or (c) the failure to exhaust was the prisoner's fault, in which event the case is over." *Id.* On the other hand, "[i]f and when the judge determines that the prisoner has properly exhausted his administrative remedies, the case will proceed to pretrial discovery, and if necessary a trial, on the merits; and if there is a jury trial, the jury will make all necessary findings of fact without being bound by (or even informed of) any of the findings made by the district judge in determining that the prisoner had exhausted his administrative remedies." *Id.*

At the time that *Pavey* was decided, the parties already had briefed the exhaustion issue in connection with Defendants' motions for summary judgment. Nevertheless, in an abundance of caution, the Court allowed the parties a limited period to conduct additional discovery and to file supplemental briefs and materials on the exhaustion issue. At a subsequent status hearing, the parties agreed that the issue was ripe for decision on the papers submitted and without a further oral hearing.

**B.     The controlling law on exhaustion under the PLRA**

Under the PLRA, Congress has stated that "[n]o Action shall be brought with respect to prison conditions under § 1983 of this title, or any other federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). The purpose of the exhaustion requirement is to afford "corrections officials time and opportunity to address complaints internally before allowing the

initiation of a federal case." *Porter v. Nussle*, 534 U.S. 516, 524-25 (2002); see also *Jones v. Bock*, 549 U.S. 199, 219 (2007) (noting that exhaustion allows "a prison to address complaints about the program it administers before being subjected to suit, reducing litigation to the extent complaints are satisfactorily resolved, and improving litigation that does occur by leading to the preparation of a useful record"); *Dole v. Chandler*, 438 F.3d 804, 809 (7th Cir. 2006) ("The sole objective of § 1997e(a) is to permit the prison's administrative process to run its course before litigation begins"). Because failure to exhaust is an affirmative defense, the burden of proof lies with the prison officials, not the Plaintiffs. *Conyers v. Abitz*, 416 F.3d 580, 584 (7th Cir. 2005).

The Seventh Circuit "has taken a strict compliance approach to exhaustion. A prisoner must properly use the prison's grievance process. If he or she fails to do so, the prison administrative authority can refuse to hear the case and the prisoner's claim can be indefinitely unexhausted." *Dole*, 438 F.3d at 809. Accordingly, "[t]o exhaust remedies, a prisoner must file complaints and appeals in the place and at the time, the prison's administrative rules require." *Pozo v. McCaughtry*, 286 F.3d 1022, 1025 (7th Cir. 2002) Moreover, there is no futility exception to PLRA's exhaustion requirement. See *Perez v. Wisconsin Dept. of Corrections,* 182 F.3d 532 (7th Cir. 1999); *Massey v. Helman*, 196 F.3d 727 (7th Cir. 2000). "[I]f a prison has an internal administrative grievance system through which a prisoner can seek to correct a problem, then the prisoner must utilize that administrative system before filing a claim. The potential effectiveness of an administrative response bears no relationship to the statutory requirement that prisoners first attempt to obtain relief through administrative procedures." *Massey*, 196 F.3d at 733. In short, "[e]xhaustion is required even if the prisoner believes his efforts in securing relief will be futile or if the administrative authority has no power to grant the requested relief." *Obriecht v. Raemisch*, 517 F.3d 489, 492 (7th Cir. 2008) (citations omitted).

### C. Application of law to the circumstances of this case

As noted above, the PLRA obliges a prisoner who wishes to complain about prison conditions to forestall the filing of a lawsuit "until such administrative remedies *as are available* are exhausted." 42 U.S.C. § 1997e(a) (emphasis added); see also *Riccardo v. Rausch*, 375 F.3d 521, 524 (7th Cir. 2004) (failure to follow state rules about the time and content of grievances "means failure to use (and thus to exhaust) *available* remedies") (emphasis added). As the Seventh Circuit has noted, "[b]ecause the PLRA does not say when a process is 'available,' the court must apply the ordinary meaning of the term." *Kaba v. Stepp*, 458 F.3d 678, 684 (7th Cir. 2006). Common dictionary definitions of "available" include "usable," "handy," and "accessible" (see WEBSTER'S NEW WORLD COLLEGE DICTIONARY 97 (4th ed. 2007)) and "readily obtainable" (see http://dictionary.reference.com/browse/available?qsrc=2888 (last visited on March 9, 2009)). The Seventh Circuit further has stated that because "[t]he ability to take advantage of administrative grievances is not an 'either-or' proposition" in every instance, sometimes "a more discriminating analysis is necessary." *Kaba*, 458 F.3d at 684-85.

While the case law on what constitutes "availability" is not well developed, it is clear, for example, that a grievance cannot be dismissed on exhaustion grounds "because of a requirement on which the administrative rulebook is silent" and that administrative remedies become "unavailable" if "prison employees do not respond to a properly filed grievance or otherwise use affirmative misconduct to prevent a prisoner from exhausting." *Dole v. Chandler*, 438 F.3d 804, 809-10 (7th Cir 2006); see also *Brengettcy v. Horton*, 423 F.3d 674, 682 (7th Cir. 2005). *Pavey* also suggests that a prisoner's physical infirmities may render administrative remedies unavailable. See 544 F.3d at 740 (noting that plaintiff submitted "an affidavit which stated that he had been unable to exhaust [his administrative] remedies because he could not prepare the

grievance himself, as he is left-handed and it was his left arm that was broken"). The Court sees no reason not to consider, as part of a "discriminating analysis," both physical and mental infirmities as possible reasons that generally available administrative remedies might be "unavailable" in a particular instance. Indeed, the IDOC regulations recognize that prisoners who are "impaired, disabled, or unable to communicate" may require special assistance in filing grievances. 20 Ill. Admin. Code § 504.810(c)(2).

### 1. Remedies available to Johnson himself

Were any remedies "available" – that is, "accessible" or "readily obtainable" – to Johnson in his physical and mental condition? Taken as a whole, the record shows that as of the time period in which a grievance could have been timely filed concerning the events giving rise to this lawsuit (approximately May 2007), Mr. Johnson could not write, could not ambulate, increasingly could not make himself understood, and may even have been irrational or delusional at times. Given that constellation of physical and mental impairments, the Court concludes that Mr. Johnson was not capable, on his own, of creating "a written grievance on a grievance form" and depositing it in a designated mailbox (20 Ill. Admin. Code § 504.810(a)), or even of "request[ing] staff assistance" to prepare a grievance for him (20 Ill. Admin. Code § 504.810(c)). In the briefing on this issue, the parties have extensively debated whether Mr. Johnson was legally incapacitated, but that is not the right question, for even the regulations recognize that offenders may be "impaired, disabled, or unable to communicate" and thus unable to access the grievance procedures on their own. And those same regulations impose an obligation on each IDOC "facility" to "take reasonable steps to ensure that the grievance procedure is accessible to offenders who are impaired, disabled, or unable to communicate in the English language." 20 Ill. Admin. Code § 504.810(c)(2).

Of course, no reasonable reading of Section 504.810(c)(2) could insist that prison officials be clairvoyant or entirely proactive, such that they would be required to ask impaired or disabled offenders whether they had any complaints. But that is where the letters filed on Johnson's behalf that clearly came to the attention of key officials at the "facility" come into play. Those letters plainly put the "facility" on notice that, at a minimum, Johnson may wish to raise "an asserted shortcoming" in the medical care that he was receiving, which is all that a grievance must do under the "notice-pleading" regime provided in the Illinois administrative rules. See *Riccardo*, 375 F.3d at 524; *Strong v. David*, 297 F.3d 646, 650 (7th Cir. 2002). At that point, the mandatory language of the applicable regulation – "Each facility shall take" – required somebody from Dixon to "take reasonable steps to ensure that the grievance procedure [was] accessible" to Johnson, either by working with him or with his mother or the lawyers to get a proper grievance on file. There is no evidence that anyone – Johnson's "inmate porter," his counselor (Mr. Maroney), or any one else – took any steps whatsoever in that direction during the relevant time period between the development of Johnson's bed sores and the filing of the lawsuit, and thus the Court concludes that the regular grievance procedures were not "available" (or made available) to Johnson so that he could exhaust on his own.[4] See, *e.g.*, *Kaba*, 458 F.3d at 684 ("If administrative remedies are not 'available' to an inmate, then the inmate cannot be required to exhaust").

---

[4] The fact that Mr. Johnson was informed of the grievance procedures at one or more times during his incarceration, including as late as April 2006, and that he invoked those procedures successfully as late as 2003 does not undermine the analysis set forth above, for it is undisputed on this record that Mr. Johnson's physical and mental conditions had deteriorated markedly by May 2007.

12

### 2. Efforts to invoke remedies on Johnson's behalf

In addition, where a prisoner has been unable to lodge a grievance, at least one court in this district has found it "entirely proper for us to consider actions taken on [the prisoner's] behalf in addition to those he took himself." *Collins v. Seeman*, 2004 WL 406773, at *2 (N.D. Ill. Feb. 26, 2004) (Kocoras, J.). *Collins* was an extreme case, in that the prisoner had committed suicide. *Id*. at *1. Although this fortunately is not a case involving "prisoner suicide," the record amply establishes the physical and mental infirmities suffered by Johnson that made formal compliance with the prison's exhaustion requirements virtually impossible and thus rendered the usual administrative remedies unavailable to Johnson acting alone. The question is whether those who acted on Johnson's behalf "did what [they] could to resolve [the] dispute through administrative channels," but were unable to find "remedies to pursue," for "[t]he PLRA requires no less and no more." *Id*. at *2.

In regard to the efforts made on Johnson's behalf, Defendants acknowledge that Ms. Johnson-Ester and Plaintiffs' attorneys "agitated for better care through correspondence and by inciting others to write on [Mr. Johnson's] behalf." [150, at 3.] It is undisputed that the letters sent on Mr. Johnson's behalf to Defendants and other IDOC officials described concerns about Mr. Johnson's medical condition and the level of medical care that he was receiving at Dixon. Those letters plainly cleared the low bar for a grievance under Illinois law, for they "object[ed] intelligibly to some asserted shortcoming" and "alert[ed] the prison to the nature of the wrong for which redress is sought." *Riccardo*, 375 F.3d at 524. The record also clearly reflects the facts that the letters were received, that various IDOC personnel discussed and even prepared draft responses, and that no formal responses ever were sent. In short, there is no question on this

record that the Warden and other prison officials and medical personnel were aware of Johnson's grievances.

Defendant Ngu raises the question of why, if attorneys and family members were able to write letters to prison officials on Mr. Johnson's behalf, they could not just as easily have filed grievances or assisted him in filing grievances through the formal channels. [See 149, at 2.] It is true that the resolution of the exhaustion issue might have been much simpler had Plaintiffs carefully scrutinized the Administrative Code and pointed out to Defendants their obligations to assist Johnson (or his agents) in the preparation of a grievance that could have been deposited in the "living unit mailbox" or otherwise transmitted to the responsible authorities in a manner that everyone agreed was appropriate under the regulations. But Defendants' contention that Ms. Johnson-Ester and Plaintiffs' lawyers could (and should) have invoked the formal grievance procedures might be more persuasive if the regulations told them how to do so. Because the regulations speak to procedures for "offenders" and invite the filing of a grievance to be deposited in a "living unit mailbox or other designated repository," it is by no means self-evident how Johnson (in his severely impaired condition) or his agents (non-offenders) should have complied. And while there might have been practical or functional ways of construing the procedures to enable others to file a grievance on Mr. Johnson's behalf, there is no evidence that Defendants or anyone affiliated with the IDOC suggested any such alternatives to the written rules, which provide no clear guidance for these admittedly unusual circumstances.

Where, as here, the applicable "regulations were not clear about how to proceed" in a given set of circumstances (*Dole*, 438 F.3d at 810) – as was the case in, for example, *Dole* and *Brengettcy*, 423 F.3d at 682 – the Seventh Circuit has given prisoners the benefit of the doubt to avoid situations where prisoners are "procedurally 'mousetrapped' by the PLRA." *Id*. at 809; see

also *Pavey*, 544 F.3d at 742 (suggesting that prison officials may not give prisoners "a runaround" in connection with the exhaustion process); *Riccardo*, 375 F.3d at 524 (noting the obligation of prison officials to "adopt appropriate regulations and inform prisoners what is required of them"). Applying the teaching of those precedents to the special (and perhaps unique) circumstances of this case, the Court concludes that Plaintiffs (and their agents) cannot be charged with failure to exhaust simply because they did not use the formal channels set forth in Section 504.810.

In any event, in view of the seriousness of the medical issues raised in the letters sent on Johnson's behalf to IDOC officials (including Warden Chandler), those letters may be viewed as invoking the emergency procedures of Section 504.840 of the Administrative Code, which permits a grievance to be forwarded "directly to the Chief Administrative Officer." See Def. SJ Mem. [57], at 6 (acknowledging that "[g]rievances can go directly to the warden if there is a risk of imminent injury or irreparable harm to the inmate"). Alternatively, the Dixon Orientation Manual provided by Defendants in their supplemental submission on the exhaustion issue provides yet another basis for concluding that the actions taken on Johnson's behalf constitute exhaustion of available administrative remedies. The Manual states that "[i]n addition to the formal procedures for grievances that follow in this section, it should be noted that other informal means are available for an inmate to bring complaints or request[s] to the attention of staff." [201-3, at 28.] It goes on to say that "[i]nmates may place sealed, written complaints or problems addressed to the Warden or other staff in the locked mailbox located in each housing unit," which are "collected and routed directly to the addressee." *Id.* For the reasons stated above, Johnson could not be expected to use the locked mailbox or indeed to put together a grievance of any kind on his own given his condition. But the availability of "informal means"

15

of bringing complaints, including by addressing them directly "to the Warden," strongly suggests that Defendants' insistence on rigid compliance with the formal rules on filing grievances is not well founded, particularly in the circumstances of this case.

## III. Conclusion

As noted above, failure to exhaust is an affirmative defense. In this instance, for the reasons stated above, Defendants "did not meet their burden of proving that [Plaintiffs] had available remedies that [they] did not utilize." *Dale v. Lappin*, 376 F.3d 652, 656 (7th Cir. 2004) (per curiam). To begin with, Johnson's physical and mental condition rendered him unable to invoke and exhaust any administrative procedures on his own. The efforts made on Johnson's behalf, at a minimum, placed Defendants on notice that Johnson may have wished to air a grievance and thus triggered the self-imposed obligation to take "reasonable steps to ensure that the grievance procedure" was "accessible" to Johnson in his "impaired" and "disabled" condition. Moreover, the letters sent on Johnson's behalf to Warden Chandler (among others) describing seriously infected wounds on an inmate with an already-compromised immune system can be fairly read as an effort to submit an emergency grievance, which under the regulations may be sent directly to the Warden. For all of these reasons, under *Pavey*, this case will proceed on the merits. Defendants' motions for summary judgment [55, 60] are hereby reinstated as to the non-exhaustion issues. The parties are given 14 days from the date of this order to submit any supplemental authority (or authorities) that may have been decided since the filing of the briefs in support of and in opposition to the now-reinstated motions that may bear on the proper disposition of those motions.

Dated: March 9, 2009

_____
Robert M. Dow, Jr.
United States District Judge